IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN WILLIAM SCHARNHORST, III                                      PLAINTIFF

v.                      Civil No. 5:22-CV-05238-TLB-CDC

CHIEF DEPUTY JAY CANTRELL; CORPORAL CAUDLE;
CORPORAL DOMINICK NUNZIATO; DEPUTY FRYE;
DEPUTY BECK; DEPUTY DRUMRIGHT; DEPUTY BILBREY; and
DEPUTY MARTINEZ                                                    DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff John William Scharnhorst, III, a prisoner, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983.  (ECF No. 1).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.  Currently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 34).

## I.      PROCEDURAL POSTURE

This Court previously described the background of this case in its Report and Recommendation denying Plaintiff's Motion for Contempt (ECF No. 64) and that background is incorporated here by reference.  Relevant here, upon preservice review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A(a), this Court recommended that Plaintiff's individual and official capacity claims against Defendants Cantrell, Caudle, Fry,[1] Beck, Nunziato, Drumright, Bilbrey, and Martinez proceed but that claims against all other defendants be dismissed without prejudice.

---

[1] While Defendant Fry is spelled "Frye" in the case caption, Defendants spell it "Fry" throughout their Motion for Summary Judgment.   This Court, therefore, does the same.

1

(ECF No. 8).   Judge Brooks adopted those recommendations without objection.   (ECF No. 11).

Thus, the following of Plaintiff's claims are pending:

(1) Plaintiff contends that from January 20, 2022, to January 23, 2022, and from August 1, 2022, to August 2, 2022, Defendant Caudle failed to properly maintain the Washington County Detention Center ("WCDC") HVAC system, causing him to nearly freeze to death from the cold for four days and experience sweltering heat for two days in violation of the Fourteenth Amendment Due Process Clause and his Eighth Amendment right to be free from cruel and unusual punishment.   Plaintiff identifies Defendant Caudle in his individual and official capacity, on the grounds that "subjecting detainees to inhumane conditions of confinement is completely acceptable, common widespread practice, trained, condoned, and encouraged by the management down the entire chain of command." (ECF No. 1, p. 6).

(2) Plaintiff says that from December 10, 2021, to January 31, 2022, Defendant Caudle was notified that his toilet was leaking, "causing a pool of foul water on the floor of his cell," but Defendant Caudle neglected to repair the issue.   (ECF No. 1, p. 7). According to Plaintiff, he was eventually moved to a different cell, but he continued to experience plumbing issues. Specifically, Plaintiff contends that from July 10, 2022, to November 10, 2022, his toilet would fill with sewage from other cells.   Plaintiff says that on July 15, 2022, his toilet became unusable and filled with "raw sewage," and on the night of July 19, 2022, the sewer backed up raw sewage into his cell.   *Id.* Plaintiff contends that Defendant Caudle was notified of these problems, but he failed to properly address them.   *Id.*   Plaintiff identifies Defendant Caudle in his individual and official capacities, contending that "neglecting plumbing and maintenance issues is completely acceptable, Caudle's failure is common knowledge and regularly joked about . . . He is protected from on high by Tim Helder and Jay Cantrell." *Id.* at p. 9.

(3) Plaintiff says that from August 22, 2022, to October 3, 2022, Defendant Caudle failed to repair the broken light in his cell, leaving him in a dark cell "for weeks," even though Defendant Caudle was both responsible for and aware that his light needed to be replaced. (ECF No. 1, p. 10). Plaintiff identifies Defendant Caudle in his individual and official capacities, on the grounds

that Defendant Caudle "refuses to make repairs to all sorts of things and this is perfectly acceptable to Randall Denzer and all of his subordinates. Tim Helder and Jay Cantrell do nothing to ensure the maintenance of the jail." *Id.* at pp. 9, 13.

(4) Plaintiff contends that from December 10, 2021, to December 7, 2022, Defendants "Frye, Beck, Nunziato, Drumright, Bilbrey, and Martinez have used [the] issue of filth [at the WCDC] to harass and antagonize [him] by forcing themselves into [his] cell with brooms and mops contaminated with urine and feces and spreading it all over [his] floor." (ECF No. 1, p. 12).   Plaintiff says that he has "written letters to Chief Deputy Cantrell, Major Randall Denzer and had in person meetings with Captain Ake and as of [December 7, 2022] there is no trash can in A-1 and there is sewage in the cracks (expansion joints) of the floor, mold in the showers and insects breeding in the filth and flying around the cell block." *Id.*

On October 24, 2023, Defendants filed a Motion for Summary Judgment on the merits, along with a statement of facts and twenty-two (22) exhibits in support, including several surveillance videos.   (ECF Nos. 34-35).   After four requests for an extension of time to respond to Defendants' Motion for Summary Judgment (ECF Nos. 39, 43, 57, 63), on March 29, 2024, Plaintiff submitted his response and a 252-page statement of disputed facts. (ECF Nos. 66-67). On April 3, 2024, this Court denied as moot Plaintiff's fourth request for an extension of time to submit his response.   (ECF No. 68).   On April 22, 2024, Plaintiff filed a motion requesting to supplement his response with a disciplinary request he submitted on the WCDC kiosk system on November 21, 2022.   (ECF No. 70).   Defendants did not object and provided the video of the incident referenced in the disciplinary request.   (ECF Nos. 71-72).   This Court subsequently granted that unopposed motion. (ECF No. 73). Defendants have not filed a separate reply. Defendants' Motion for Summary Judgment is ready for the Court's consideration.

3

## II.      LEGAL STANDARD

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001).   In response, the nonmoving party "may not rest upon mere denials or allegations but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## III.     FACTS

This Court starts with the facts, viewing all the evidence and inferences in the light most favorable to the Plaintiff, the nonmoving party.[2]   *Anderson*, 477 U.S. at 255.

### A. Washington County Detention Center Policies and Procedures

On November 18, 2021, Plaintiff was booked into the Washington County Detention

---

[2] In support of their respective positions, both parties submitted copies of Plaintiff's kiosk submissions and excerpts from the "WCDC Help Desk Tickets Report From 11/18/21 Through 01/17/2023" ("WCDC Help Desk Report").  *See, e.g.*, (ECF No. 35–3 (Plaintiff's kiosk submissions provided by Defendants)); (ECF No. 35-7 (portion of the WCDC Help Desk Report submitted by Defendants)); (ECF No. 67, pp. 136–238, 243–245; 250 (Plaintiff's kiosk submissions provided by Plaintiff)); (ECF No. 67, pp. 32-135 (portion of the WCDC Help Desk Report submitted by Plaintiff)).   While there is significant overlap in the record, for clarity, when referencing a particular kiosk entry or maintenance ticket, the Court will only identify one docket entry, unless otherwise noted.

Center ("WCDC") on several felony charges.   (ECF No. 35-2).   According to the WCDC Policies and Procedures Manual ("the WCDC Manual"), "[t]he primary objective of the detention center is to maintain positive control over incarcerated individuals and to ensure an arrestee's timely appearance in court.   It is NOT to inflict punishment."   (ECF No. 35-11, p. 6).   Further, relevant here, the WCDC Manual provides that "[t]he detention center shall be kept at a reasonable temperature and be properly ventilated at all times.   Sufficient lights shall be provided commensurate with the time of day.   Lighting shall be sufficient to read, write, and work during daylight hours.   Lighting during nighttime hours shall be sufficient for officers and detainees to move around safely within the detention center." *Id.* at p. 5.   The WCDC Manual, moreover, establishes that it is the responsibility of staff to take "corrective action" "immediately whenever possible." *Id.*

The Washington County Detention Center Handbook ("WCDC Handbook") is available for inmates to read on the WCDC kiosk system.   (ECF No. 35-12, p. 3).   According to the WCDC Handbook, "[d]etainees shall clean their cells, cellblock, and day room each morning … Cleaning supplies will be delivered three times per day, after each meal, and you will be required to clean the dining area.   The facility staff, as required, shall issue cleaning materials …The detention staff will issue supplies for cleaning the shower, toilet, and sink area." *Id.* at p. 10.   "Failure to comply with the cleaning requirements will result in the suspension of privileges." *Id.*

Further, the WCDC Handbook explains that "[t]he heating, air conditions, and ventilation are computer controlled.   Fresh air is brought in from outside, filtered and then dispersed throughout the Detention Center.   Stale air is exhausted.   It is not re-circulated.   Adjusting the air temperature is not instantaneous.   Be patient." *Id.* at p. 17.   The WCDC Handbook warns

5

against tampering with the plumbing "in any manner," explaining that "if [an inmate] damage[s] the plumbing, [the inmate] will be subject to criminal charges and/or a civil suit." *Id.* The WCDC Handbook emphasizes, in bold, italicized, and underlined text, "[d]o not interfere, block, or tamper with the vents or any part of the ventilation system.   The system is difficult to repair, and such actions will result only in your discomfort." *Id.*

The State of Arkansas Department of Corrections ("ADC") inspected the WCDC on July 15, 2021, and April 13, 2022. (ECF No. 35-22, pp. 1, 11). The July 2021 inspection report ("2021 ADC Report") lists Randall Denzer as the facility supervisor (ECF No. 35-22, p. 1), and identifies several challenges the facility is facing due to overcrowding, specifically noting:

> Due to lack of space, in recent years, due to the inmate population count, the site has and is aging at a more rapid pace.   With high numbers of inmates, staffers are not able to address needed maintenance goals/physical plant objectives. (As an example, due to current trends, the staffers are not able to properly update a number of plumbing fixtures and general components such as doors).
>
>  . . .
>
> Due to lack of space, it appears that the climate control equipment/system struggles as to works to maintain temperature goals.

*Id.* at p. 3.

The report further concludes that "due to the above [overpopulation] trends, some areas of the building do not comply with Arkansas Jail Standards.   The non-compliance is due to space/housing issues."   *Id.* at p. 4.   The 2021 ADC Report itself identifies the WCDC as being "out of compliance" in the following areas: (1) separating inmates by "class;" (2) providing exercising outside of the cell area; (3) the cells' "footage requirement;" and (4) providing adequate space for administrative and staff functions.   *Id.* at pp. 6, 8, 9.   The 2021 ADC Report also notes

concerns with staffing levels. *Id.* at pp. 4, 5.   Relevant here, however, the 2021 ADC Report identifies that the facility is "in compliance" with (1) garbage being removed from the cells immediately after meals; (2) providing adequate lighting; and (3) maintaining the temperature "at a proper level."   *Id.* at pp. 7, 9.

The April 2022 ADC Inspection Report (2022 ADC Report) also names Randall Denzer as the facility supervisor, *Id.* at p. 11, and identifies several challenges facing the facility due to overcrowding and staffing levels.   Specifically, the 2022 ADC Report notes:

> Due to the current staff level, the site appears to age at a more rapid pace.  It appears that employees struggle as they work to protect county property (vandalism activity).   Based on current jail activity; the site needs more staffers.
>
> . . .
>
> Due to current staff level, the site often struggles in terms of training goals, paperwork, sanitation, supervision, safety goals, emergency protocols, turnover rates, administrative services, and like aspects. The Review Committee urges the County to continue its work with respect to recruitment and retention.
>
> . . .
>
> The current inmate population/composition and agency work has exceeded the detention center's operational capacity.
>
> . . .
>
> Due to lack of space, in recent years, due to the inmate population count, the site has and is aging at a more rapid pace.  With a high number of inmates, staffers are not able to address needed maintenance goals/physical plant objectives. (As an example, due to current trends, the staffers are not able to properly update a number of plumbing fixtures and general components such as doors).
>
> . . .
>
> Due to lack of space, it appears that the climate control equipment system struggles as it works to maintain temperature goals.

. . .

Due to lack of space, it appears that the employees struggle as they attempt to provide programming, support service activities, and like aspects.

. . .

Due to the above [overcrowding and staffing] trends, some areas of the locations do not comply with Arkansas Jail Standards. The non-compliance is due to space/housing issues.

(ECF No. 35-22, pp. 12, 13, 14, 15).

The 2022 ADC Report identifies the WCDC as being "out of compliance" in the following areas: (1) inmates being separated by class; (2) sufficient personnel being on duty at all times; (3) providing exercise outside of the cell area; (4) cells meeting the "footage requirement;" (5) providing adequate space for administrative and staff functions.  *Id.* at pp. 17, 19, 20. Further, relevant here, the 2022 ADC Report says that the WCDC is "in compliance" with: (1) garbage being removed from the cells immediately after meals; (2) providing adequate lighting; and (3) maintaining the temperature at a proper level.  *Id.* at pp. 18, 20.

## B.  Defendant Sam Caudle

Defendant Sam Caudle is a civilian employee of the Washington County Sheriff's Office ("WCSO").  (ECF No. 35-14, p. 1).   He "perform[s] maintenance in and around the Washington County Sheriff's office and Detention Center."  *Id.*   Defendant Caudle has "experience and training in maintenance and [has] been working in building maintenance for many years."  *Id.* "That training has been provided by professionals or, in some instances, by the manufacturer of products used in the Washington County Detention Center such as the plumbing fixtures."  *Id.* at p. 2.

8

Because he is a civilian employee, Defendant Caudle is not part of the WCSO chain of command and thus holds no rank.   *Id.*   Defendant Caudle is not trained or supervised directly by the Chief Deputy or by WSCO personnel.   *Id.*   Specialized Deputy Korey Weathers is Caudle's supervisor and the "only time that the Chief Deputy is contacted by maintenance is relative to the need to make a large expenditure for repair or to purchase a piece of equipment."   *Id.* at pp. 1-2. Defendant Caudle's work schedule is Monday through Friday, 5:00 am to 1:00 pm.   *Id*. at p. 2. "If an officer in charge of the detention center deems a maintenance situation an emergency or serious security issue outside of [his] [regular] work schedule, they can call [him] and [he] will report to work to perform the repairs as quickly as possible in order to maintain the safe operation of the Washington County Detention Center."   *Id.* at p. 2.   According to Defendant Caudle, the officer in charge of the detention center determines, at the officer's discretion, whether a situation constitutes an emergency, and he is not aware of a problem unless the officer calls and notifies him.   *Id.*   Examples of situations that could be considered an "emergency" include, "a water line burst, a power outage, an air compressor failure (making a door not operational), or an inmate riot which resulted in damage or destruction to necessary features of the detention center."   *Id.* Defendant Caudle says that he is "often called in to handle urgent safety issues; sometimes two or three times per week."   *Id.*

According to Defendant Caudle, "Sheriff's office personnel enter maintenance issues into the system by placing a 'ticket' in the help desk listing.   The maintenance staff, including myself, then goes through the issues and perform maintenance, or repair or replace non-working or damaged items as soon as possible."   *Id.* at p. 3.   Defendant Caudle says that "[w]hen [he] arrive[s] at work each weekday morning, [he] review[s] the maintenance tickets and handle[s] the

most urgent or safety sensitive issue first, working [his] way down the list as quickly as possible."
*Id.*   Defendant Caudle explains that "[o]ften, when [he] is in the building, if an issue arises, a
detention officer or supervisor will report the issue to [him] verbally and [he] will handle it
immediately. In that case, the issue or repair will not be documented in the 'help desk-tickets'
listing." *Id.*   Further, "[w]hen a problem is reported with the air conditioning, heating, ventilation,
plumbing, or electrical features of the building, a maintenance employee, like [Defendant Caudle],
will check the problem and repair it if possible. If the problem is more significant and [maintenance
is] not able to repair it [themselves], outside professionals will be brought in for the repair."   *Id.*
at p. 2.

Defendant Caudle says that he "attempt[s] to close maintenance tickets that are in the
system on the same day the work is done, but sometimes it could be delayed until the next day or
so, depending on how much work there is to be done or if it completed late in [his] work day or
when [he] is called in at a time when [he] is not scheduled to work." *Id.* at p. 3.   He explains that
"[r]epairs or replacements may be delayed for various reasons.   For instance, they may be delayed
because of the volume of work that needs to be done; because the issue is not a safety or security
issue; because personnel are limited; or because other parts or professionals are necessary." *Id.*
Defendant Caudle says that he "always attempt[s] to respond to the most serious security issues
first."   *Id.*

Defendant Caudle had a performance evaluation on December 1, 2021.   (ECF No. 35-8).
That evaluation shows that the evaluator rated Defendant Caudle at either a "4" ("at times exceeds
job requirements" or a "5" ("consistently exceeds job requirements") in all categories, including
"problem solving/judgment," "productivity/attendance," "skill level," and "dependability." *Id.*   In

the remarks section of the "skill level" category, the evaluator noted that "Sam shows great knowledge of the equipment and the facility."   *Id.* at p. 2.   In ranking Defendant Caudle's "skill level," the evaluation directs the evaluator to consider the extent to which he "demonstrates knowledge and skill of a specific job; demonstrates effective use of equipment; exhibits professional skills per job requirements; efficient and effective use of District resources; and maintains certifications as required."   *Id.* at p. 3.   Plaintiff asserts that he requested Defendant Caudle's performance review for 2022 but was told that "there is no record of an evaluation in 2022."   (ECF No. 67, p. 3).

### C.  Claims

#### *Claim One*

Plaintiff contends that he experienced "freezing" temperatures from January 20, 2022, to January 23, 2022, and "sweltering" heat from August 1, 2022, to August 3, 2022.   (ECF No. 1, p. 5).   He says that "[c]ivil rights violations is standard operating procedure [at the WCDC]. Leaving detainees in freezing temps or sweltering conditions is a common occurrence."[3]

#### a.  Freezing Temperatures

Starting with the claims of "freezing temperatures," on January 22, 2022, submitted the following grievance on the WCDC kiosk system:

> It's been freezing in here for 2 days.  We've notified the floor guards and the tower through the intercom.  You are violating our 8th amendment rights by subjecting us to cruel and unusual punishment.  We are sick with COVID and freezing to death now as well.

---

[3] While Plaintiff's "claim one" includes additional claims, those claims were dismissed after the Court's preservice review for failure to state a claim as a matter of law pursuant to 28 U.S.C. § 1915A(b)(1).  *See* (ECF Nos. 8, 11).

(ECF No. 35-3, p. 14).[4]  Sgt. Bradshaw responded the next day, writing, "Maintenance is being contacted about the heating issues in A-Pod."  *Id.*

Plaintiff's WCDC housing history indicates that he was housed in Pod "A," Cell "R" from December 5, 2021, to February 1, 2022.   (ECF No. 35-9, p. 1). The temperature logs for "Pod A R-Block" reflect that on January 20, 2022, it was 67 degrees Fahrenheit at 6:00 pm, but was otherwise approximately 71 degrees Fahrenheit.   (ECF No. 35-6, p. 1).   These temperature logs show that on January 21, 2022, the temperature was between 70–71 degrees Fahrenheit from 1:00 am to 5:00 pm, and then decreased to 59.5 degrees Fahrenheit at 6:00 pm, but then increased to 67 degrees Fahrenheit at 7:00 pm, was approximately 68 degrees Fahrenheit from 8:00 pm to 10:00 pm and then decreased to 67.5 degrees Fahrenheit at 11:00 pm.   *Id.* at pp. 1-2.

According to these temperature logs, on January 22, 2022, the temperature started at 67.5 degrees Fahrenheit at 12:00 am (midnight) and then decreased throughout the day until it hovered around 61–60 degrees Fahrenheit from 2:00 pm to 10:00 pm before ending the day at 11:00 pm at 59.5 degrees Fahrenheit.   *Id.* at p. 2.   On January 23, 2022, the temperature started at 59.5 degrees Fahrenheit at 12:00 am (midnight) and then increased throughout the day until it was 70 degrees Fahrenheit by 10:00 pm.   *Id.* at pp. 2-3.   On January 24, 2022, the temperature started at 70.5 degrees Fahrenheit and then increased to 71 degrees Fahrenheit throughout the day, hitting a high of 72 degrees Fahrenheit by 9:00 pm before ending the day at 71.5 degrees Fahrenheit by 11:00 pm.   *Id.* at p. 3.

The WCDC Help Desk Report shows that on January 23, 2022, Dustin Carter entered a

---

[4] The summary judgment record reflects that Plaintiff complained about the cold temperatures at least twice on January 22, 2022.   *See* (ECF No. 35-3, p. 22).

maintenance request ticket because "R-Block heat is not turning on, having lots of complaints from

detainees."  (ECF No. 35-7, pp. 1-2).   That report shows that Defendant Sam Caudle closed the

ticket on January 24, 2022, reporting that "[h]eat is working fine at this time."   *Id.* at p. 2.

### b.   "Sweltering Heat" from August 1, 2022, to August 2, 2022

With respect to the claims of excessive heat, Plaintiff says that from August 1, 2022, to

August 2, 2022, the HVAC "quit working in Q block."   (ECF No. 1, p. 6).   He says that the

"temperature became sweltering and the issue was again neglected by . . . Caudle . . ."[5]   *Id.*

On August 1, 2022, Plaintiff entered a grievance, saying, "[t]he HVAC is not working in

A6, can you please put in a maintenance request.   Thanks."   (ECF No. 35-3, p. 51).   Sgt. Joseph

Malone responded the next day saying, "Yes, Mr. Scharnhorst there is one in on this issue."   *Id.*

Defendants submitted no evidence of the temperature of Plaintiff's cell from August 1, 2022, to

August 3, 2022.

### *Claim Two*

Plaintiff asserts that from December 10, 2021, to January 31, 2022, the toilet leaked in his

cell.  (ECF No. 1, p. 7).   Plaintiff says that while he was moved to another cell block on February

1, 2022, he experienced plumbing problems with the toilet in his new cell from July 10, 2022, to

November 10, 2022.   *Id.*   Plaintiff says that the toilet became unusable on July 15, 2022, because

it was filled with sewage and eventually overflowed the night of July 19, 2022.   *Id.* at pp. 7-8.

Plaintiff contends that he submitted grievances and requests on the kiosk asking for the plumbing

problems to be addressed, but Defendant Caudle was allowed to neglect the problem.   *Id.*

---

[5] Plaintiff also identifies Denzer and Lt. A. Arnold as defendants to this claim, but, as previously noted, the claims against these defendants were dismissed after preservice screening for failure to state a claim as a matter of law.   28 U.S.C. § 1915A(b)(1).   (ECF Nos. 8, 11).

According to Plaintiff, although he was moved to "K-block," the same plumbing problems persisted until they were finally resolved on November 11, 2022. *Id.* at p. 8.[6]

### a. Leaky Toilet

Plaintiff's complaints about his leaky toilet are well documented in the summary judgment record.

On December 13, 2021, Plaintiff entered the following into the WCDC kiosk:

> The toilet in my cell (R21) leaks on the floor and is possibly a contributing factor to the mold growing on the walls and ceiling. The hot water does not work in the day room or any of the other cells in R block causing a constant flow of traffic into my cell by other detainees needing warm water to wash their hands after urinating, defecating, etc.

(ECF No. 35-3, p.1). Cpl. David Sorrell responded the next day, saying "[a] repair order has been put in. Thank you." *Id.*

On December 15, 2021, Plaintiff entered another grievance on the kiosk, saying, in pertinent part:

> I'm filing this grievance [for] the fact that there are sanitary issues . . . The entire floor is constantly saturated from leaks causing mold and other health concerns. The toilet in cell R21 has been leaking onto the floor for months causing black mold to grow on the walls and ceilings and the [blanket] being used to soak up the water is not only disgusting, but a health hazard as well and does not constitute a "remedy" to the problem.

(ECF No. 35-3, p. 2). The next day, Defendant Mulvaney responded:

> Sir, Maintenance was in there this morning and fixed the toilet and the hot/warm water issue. The rest of this is regarding cleaning

---

[6] Upon preservice review pursuant to 28 U.S.C. § 1915A(a), only the claims against Defendant Caudle for purportedly failing to properly (and timely) repair the plumbing issues and the claim against Defendant Cantrell for purportedly failing to properly supervise Defendant Caudle remained pending, all other claims were dismissed for failure to state a claim as a matter of law. *See* (ECF Nos. 8, 11).

14

issues.   Cleaning supplies are given at least 3 times a day, and it is the detainee's responsibility to clean their housing area.   Please make sure you read the detainee handbook. Cpl. Mulvaney.

*Id.*   Plaintiff, unsatisfied with this response, replied the same day:

Maintenance was here this morning and didn't fix anything at all. Every single issue still exists. You need to get your facts straight. Please provide a ladder when you bring cleaning supplies today so that I can reach the mold on the ceiling, there is no way to reach it otherwise.   The entire block is being subjected to conditions in violation of health codes and state and federal regulations.

*Id*. at p. 3.   On December 17, 2021, Defendant Mulvaney continued the conversation, writing:

I am having staff come check the issues, the leaky toilet and water in the dayroom sink. They will also check for the "mold" you are talking about.   You will not be provided a ladder to use and clean the ceiling, as that could be a safety and security issue…

*Id.*   Again, Plaintiff countered, saying:

There is half a blanket and rags around the base of our toilet that we are [w]ringing out, rinsing and hanging out to dry due to the toilet that leaks all over the floor.   This is an issue that is very well known by all the detainees, all the guards and maintenance.   You can type whatever lies you want but the guards would not be changing out wet half blankets if it wasn't true.   Maintenance was here yesterday, verified the leak as a faulty coupler and determined that you do not have the parts to fix it and left without repairing the leak.   You guys are something else man.   FACT: The toilet in R21 leaks all over the floor and the water is being soaked up by a half blanket and rags and everyone is VERY aware of it.

*Id.* at p. 4.   On December 21, 2021, Defendant Mulvaney wrote:

Mr. Scharnhorst, I was advised and actually saw the response from maintenance saying that a fitting was tightened, which was supposed to stop the leak.   I have since learned that it evidently did not fix the issue, and I will get with maintenance personnel to see what the issue is.   It may be a parts issue, but I will try to find out.   Also, please do not call me a liar. I can only respond to what I am told, and or read from personnel. Cpl. Mulvaney.

*Id.*

15

Before Defendant Mulvaney replied to Plaintiff's December 17, 2021, response, Plaintiff

submitted a separate grievance on December 20, 2021, complaining about, among other things,

the same leaky toilet.[7]   (ECF No. 35-3, p. 5).

On December 27, 2021, Plaintiff submitted a third grievance about the leaking toilet:

> I'd like it to be noted that maintenance was just here, looked at the
> leaking toilet, saw and verified the pooling water on the floor in cell
> 21 and left without rectifying the problem. The older grouchy
> deputy in the green polo shirt who was wearing no face covering at
> all was obtuse about the matter and seemed perfectly fine pretending
> to have addressed the problem and leaving full well that the water
> was going to continue leaking as he instructed the younger tech to
> pack up and leave without making a repair…

*Id.* at p. 8.

Sgt. Jerry Workman responded that same day, saying that he would "place another

maintenance on this issue and place a copy of this request in Lt box."   *Id.*

On December 28, 2021, Defendant Mulvaney responded to Plaintiff's December 20, 2021,

grievance, saying:

> Mr. Scharnhorst, I have had maintenance come check these issues
> out (12-27-21), and these issues should be resolved, or at least
> according to them.   The water leak around the base of the toilet (not
> coming from the toilet either) was not bad at all according to him,
> and the hot water was an adjustment that had to be made…

*Id.* at p. 6.

---

[7] This grievance included Plaintiff's complaints about the failure of WCDC staff to wear masks to
prevent the spread of COVID-19, and the failure of the WCDC to provide detainees with the
opportunity to meet privately with counsel.   (ECF No. 35-3, p. 5).   These complaints are the
subject of separate lawsuits.   *See* Order, *Scharnhorst v. Cantrell, et al.*, Case No. 5:22-CV-05176-
TLB-CDC (W.D. Ark. Oct. 30, 2023) (adopting recommendation to dismiss with prejudice
Plaintiff's claims that WCDC defendants failed to wear masks to prevent the spread of COVID-
19 in violation of his constitutional rights); Order, *Scharnhorst v. Helder, et al.*, Case No. 5:22-
CV-05167-TLB-CDC (W.D. Ark. June 28, 2024) (adopting recommendation to dismiss with
prejudice Plaintiff's claims that WCDC defendants violated his constitutional right to meet
privately with counsel).

Plaintiff—unsatisfied with this response—wrote that same day, in reply:

> Maintenance was here yesterday and did nothing to rectify the leaking toilet in R21. I have 20 rags that I am using to soak up the pool of water with daily. I have an entire laundry process going on in my cell that all the guards and detainees are aware of. . .. I want to be clear that despite the claims of corrupt lying maintenance personnel NONE of the maintenance issues I've reported have been repaired in fact now the right side shower is non-op on top of everything else. I've made requests for repairs and the only thing they've accomplished is breaking the shower…

*Id.* at p. 7.

Before Defendant Mulvaney responded to this reply, Plaintiff submitted yet another grievance on January 2, 2022, complaining about the same conditions, writing, in pertinent part,

> [T]he toilet in R21 leaks all over the floor and I am soaking up dozens of rags, wringing them out and hanging them to dry on a makeshift clothesline . . . There is mold growing all around the base of the toilet and along the wall and the ceiling. The maintenance personnel and floor guards hage [sic] both made numerous inspections and diagnosed and documented these problems. I feel they are being neglected intentionally.

*Id*. at p. 9. Sgt. Aaron Bradshaw responded to this grievance the same day, writing:

> Maintenance has been made aware of the issues and has taken steps to resolve them. Some problems cannot be fixed instantly. Thank you for bringing them to our attention, now we must wait for maintenance to fix them when they can.

*Id.*

For his part, Defendant Mulvaney responded to Plaintiff's December 28, 2021, reply on January 11, 2022, writing:

> Mr. Scharnhorst. All of these issues have been repaired according to the maintenance personnel. It seems that somehow some foreign matter, and or, object had gotten into the sink drain and clogged it up to where it would not drain correctly. Also, according to the photos I have seen there was something stuck in the toilet as well causing issues. I believe extra mats were ordered…

17

*Id.* at p. 7.

On January 4, 2022, Plaintiff again documented the leaking toilet on the kiosk, writing, in part, "[f]or the record none of the plumbing issues I've been reporting for weeks have been fixed." *Id.* at p. 10.[8]   Lt. Brian Atchley responded, saying, "this maintenance request is still submitted to resolve this issue. Thank you for the information."   *Id.*   Plaintiff followed up twice on January 6, 2022, writing to again complain about the leaky toilet in R21.   *Id.* at pp. 11, 12.   Each time, WCDC officials responded saying that someone would follow up with his report.   *Id.*   On January 17, 2021, Plaintiff reported that "[t]he toilet in R21 continues to leak water after weeks of [him] reporting it [but] Nothing has been done to address the mold growing on the walls and ceiling next to [him] and above [his] head."   *Id.* at p. 13.   On January 22, 2022, Lt. Maria Carrier responded saying that she "will send deputies during noon cleaning to look at the issues your [sic] reporting and handle them accordingly."   *Id.*

The WCDC Help Desk Report shows that Landon Cradduck entered a maintenance ticket because the "[t]oilet in R-21 is leaking" on January 22, 2022.   (ECF No. 35-7, p. 1).   Defendant Caudle closed that ticket on February 25, 2022, with the note "[d]ry at this time."   *Id.*

**b.    Sewage Backup**

The summary judgment record shows that Plaintiff submitted grievances about sewage backing up into his toilet under several categories on the kiosk.

For example, on July 12, 2022, Plaintiff wrote:

> The toilet plumbing in my cell and A6-25 are clogged up and when we flush the toilet feces, urine, and toilet paper flow back and forth from one cell to another.   Please have

---

[8] It appears that Plaintiff may have submitted multiple grievances on January 4, 2022, complaining, in part, about the leaky toilet in R21.   (ECF No. 35-3, p. 21).

18

maintenance clear the drain or take whatever steps are
necessary in order to remedy this unsanitary problem.
Thank you.

(ECF No. 35-3, p. 42).[9]   That same day, Cpl. Gordon Ochieng responded, saying, "I just put a

work order for these problem [sic] I hope they fix it soon."   *Id.*   On July 18, 2022, Plaintiff wrote:

This problem has now reached critical status, the toilets cannot be
flushed without overflowing and the downstairs cells, 13&14 are
flooding onto the floor.

*Id.*   That same day, Captain Kevin East responded, "A work order has been placed.   Also, a

deputy will come look at it in the morning."   *Id.*   On July 20, 2022, Plaintiff followed up, saying:

Will you please have maintenance address the backed up toilets in
A6 block.   I've been reporting this for at least 12 days now and last
night the toilets overflowed raw sewage all over the floors and
flooded the entire cell block.

*Id.* at p. 44.   On July 23, 2022, Cpl. Gordon Ochieng responded saying, "I did put a work order

for it."   *Id.*

On July 15, 2022, Travis Bilbrey entered a maintenance ticket, because "[t]oilet in A-24

backs up to 25 and vice versa when flushed."   (ECF No. 35-7, at p. 3).   On that same day, Gordon

Ochieng entered a second maintenance ticket for the same issue, saying "[t]oilets in cells A6-25

and A6-24 are clogged up and are pushing water in out of the the [sic] two toilets when flushed."

*Id.* at p. 4.   On July 19, 2022, Jerry Workman entered a ticket describing the same issue: "A6-

24-25 are not flushing properly, and it is overflowing into cells 13-14."   *Id.* at p. 5.   On July 21,

2022, Benjamin Velasco entered a maintenance ticket because "A625 and A624 toilets are backing

up into each other."   *Id.* at p. 6.   Velasco entered a second note that same day, explaining

---

[9] Plaintiff submitted several other grievances under other kiosk categories documenting the
problem.   *See, e.g.*, (ECF No. 35-3, p. 41, 43, 45–50).

"attempted to clear with electric snake 309 Lewis stated that it would need to be unclogged using an auger." *Id.* at pp. 6-7.   Defendant Caudle closed those tickets on July 22, 2022, with the notes "[r]emoved shirt from drain line," *Id.* at pp. 3, 4, "issue resolved, repaired," *Id.* at p. 5, and "issued resolved, removed shirt from drain line," *Id.* at p. 7.   Defendant Bilbrey, however, "do[es] not recall [Plaintiff's] cell ever being flood with sewage because of [a toilet issue between two cells] or any other plumbing problem."   (ECF No. 35-17, p. 3).

On August 10, 2022, Plaintiff submitted another grievance about sewage backup in his toilet, writing:

> I want to remind you about the plumbing problem between cells 24 and 25.   When one toilet flushes it goes into the toilet of the other cell.   There is apparently some sort of blockage in the sewer pipe somewhere.   Sgt. Byrd tried to clear the line last Saturday but was unable to rectify the issue.   Will you please have a professional plumber look into this before the toilet becomes stopped up and completely and unusable with sewage sitting in it for days like what transpired recently after I'd been warning you for weeks in advance. I am again warning against a serious issue that I see on the horizon. This is exactly how it started last time and if it is not addressed I fear it will develop in a similar fashion.   Thanks.

(ECF No. 35-3, p. 52).[10]

On August 13, 2022, Cpl. Michael Smith responded saying "the has been reported to maintenance via a work order. Thank you." *Id.* But Plaintiff followed up on August 15, 2022, explaining, in pertinent part, that "[t]his issue still has not been remedied…"   *Id.*   On August 17, 2022, Cpl. Tom Mulvaney responded, "This was printed and given to maintenance; Caudle 8-17-22. Cpl. Mulvaney."   *Id.* at p. 53.

---

[10] The summary judgment record shows that Plaintiff submitted several grievances on this issue, dated August 5, 2022, (ECF No. 35-3, p. 56); August 12, 2022, *Id.* p. 57; August 16, 2022, *Id.* p. 59; August 26, 2022, *Id.* p. 60.

On August 7, 2022, Brad Morgan entered a maintenance ticket because "A6 25/24 toilet backing up and leaking." (ECF No. 35-7, p. 9).   Defendant Caudle closed the ticket on August 18, 2022, saying "[r]an auger threw [sic] the lines and adjusted water pressure.   It was working fine and both inmates were happy about the way the toilets were working."   *Id.* at p. 9.   On September 1, 2022, Tom Mulvaney entered a maintenance ticket saying:

> Scharnhorst in A1 is still complaining of the plumbing issues between A-24 and A-25.   I know this has been his ongoing complaint for a while.   He is also saying the light fixture in his cell is missing hardware and loose.   We know he has done this type of thing in the past himself.   He is also saying the door actuator is leaking air in his cell.   I will talk with pod control for verification.

(ECF No. 35-7, p. 10).   Defendant Caudle closed the ticket the same day, with the note, "issued resolved; Everything was repaired this morning except the light."   *Id.*

### *Claim Three*

Plaintiff says that when he was moved to cell 24 in A-1, he immediately notified WCDC staff of the broken light in his cell, but Defendant Caudle ignored the maintenance requests, and he was "left in a dark cell for weeks."   (ECF No. 1, p. 10).   Plaintiff says that the light was repaired on October 3, 2022.   *Id.*   Plaintiff contends that Defendant Cantrell does nothing to ensure the maintenance of the jail. [11]

On August 24, 2022, Plaintiff submitted a request on the kiosk, explaining, in part:

> The overhead light in A-1, 24 is missing several screws, the housing is loose and one of the bulbs is missing or broken.   I do nit [sic] to be blamed for this and I notified the guards yesterday and today, this is my first access to the kiosk since being moved into this cell. Please have maintenance fix the light and replace one bulb, the room

---

[11] To the extent that Plaintiff identifies additional defendants and claims as to claim two, those claims and defendants were dismissed after the Court's preservice review pursuant to 28 U.S.C. § 1915A(b)(1).   *See* (ECF Nos. 8, 11).

21

is gloomy without full functionality of the light.

(ECF No. 35-3, p. 55).

On August 27, 2022, Cpl. Jackson Vandenack responded, saying, "a work order has been put in for the light and the door."   *Id.*   Plaintiff's kiosk entries document that he complained about this issue again on August 26, 2022, saying that "[t]he light fixture on my ceiling is missing hardware and the housing is loose." (ECF No. 35-3, p. 60).   And on September 2, 2022, Plaintiff wrote: "My light still has a broken bulb and is missing several screws. Maintenance looked at it yesterday but did nothing about it."   *Id.* at p. 62.

On September 7, 2022, Plaintiff wrote, explaining:

> [The bulb] is not fixed.   The bulb is glitching, flickering on and off like a strobe light at times, making me sick to my stomach and hurting my eyes.   I'm not epilectic [sic] thank God. Please have maintenance address this.

*Id.* at p. 62.

On August 27, Jackson Vandenack submitted a maintenance request because "[t]he overhead light in A-1, 24 [Plaintiff's cell] is missing several screws, the housing is loose and one of the bulbs is missing or broken."   (ECF No. 67, p. 107).   On September 19, 2022, Brad Morgan submitted a maintenance ticket because "A1 24 light not working."   (ECF No. 67, p. 108).   On September 29, 2022, Tyler Beck submitted a maintenance request, noting "POD A1 cell A1-24 light is out and needs replace."   (ECF No.   67, p. 110).   Defendant Caudle closed that ticket on October 3, 2022, noting "issued resolved; repaired." (ECF No. 67, p. 110).   On September 27, 2022, Benjamin Velasco entered a maintenance ticket, noting "light broken in A1-24."   (ECF No. 35-7, p. 13).   Defendant Caudle also closed that ticket on October 3, 2022, noting "issued resolved; repaired."   (ECF No. 35-7, p. 13).   On September 29, 2022, Tyler Beck entered a

maintenance request because "POD A1 cell A1-24 light is out and needs replace."   (ECF No. 35-7, p. 14).   Defendant Caudle closed that ticket as well on October 3, 2022, noting "issued resolved, repaired."   (ECF No. 35-7, p. 15).   Defendant Bilbrey recalls that "[Plaintiff] was in a cell that had a very bright light for a period of time.   When he was moved, the cell he was in had a light, but it was much less bright.   [He] does not recall him ever being in a cell with no working light." (ECF No. 35-17, p. 3).

### *Claim Four*

Finally, Plaintiff contends that he has been filing grievances and complaints about his conditions of confinement at the WCDC for over a year.   (ECF No. 1, p. 11).   Plaintiff describes being exposed to black mold on the walls, ceilings, and in the shower.  *Id.*   Further, Plaintiff describes "hair and leeches in the drains," "feces, urine, rotting food, hair, food, fingernails, etc." in the expansion joints on the concrete floor, and being exposed to maggots and flying insects. He asserts that "Defendants [Cantrell, Caudle, Fry, Beck, Nunziato, Drumright, Bilbrey, and Martinez] refuse to clean up after meals" and regularly throw trash onto the floor.[12]  *Id.*   And that "there is feces everywhere due to the mismanagement of the mentally ill and the callous indifference by the above named Defendants [Cantrell, Caudle, Fry, Beck, Nunziato, Drumright, Bilbrey, and Martinez] to clean the feces spread onto the walls, floors, kiosk, phones, tablets, dining tables, etc."  *Id.*   Plaintiff also claims that Defendants Fry, Beck, Nunziato, Drumright, Bilbrey, and Martinez used his complaints about the "filth" at the WCDC to "harass and antagonize [him] by forcing themselves into [his] cell with brooms and mops contaminated with urine and

---

[12] Although Plaintiff identified additional defendants to claim four, those defendants were dismissed for failure to state a claim upon which relief may be granted pursuant 28 U.S.C. § 1915A(b)(1).  *See* (ECF Nos. 8, 11).

feces and spreading it all over [his] floor."[13]   *Id.*

Defendant Fry states that he completed the required WCSO detention officer training program.  (ECF No. 35-20, p. 1).  That program included training on cleaning practices at the WCDC.  *Id.*  According to Defendant Fry, "the standard protocol was to clean each pod after each meal.  A clean mop bucket (with clean water and cleaning solution) was used for each cleaning.  Trustees would generally collect trays and clean the bathrooms and common areas. Detention officers would go to each cell, sweep the cell out, and then mop the cell."  *Id.* Defendant Fry says that "[d]etention officers would spray sanitizing spray on the surfaces in the cells, if requested by the detainee, and the detainee could then clean the cell surfaces."  *Id.*

Defendant Fry says that "[i]f a cell obviously contained human waste, the detainee would be removed, and the cell was cleaned by detention officers and trustees and the cleaning supplies (mops or brooms or towels) would not be used in any other cell."  *Id.* at pp. 1-2.  Defendant Fry "absolutely den[ies] that [he] ever intentionally spread feces or urine all over any inmate's cell— including Plaintiff's—with a contaminated mop or broom, or any other method."  *Id.* at p. 2. Defendant Fry says that "[i]f [he] used a broom or mop to clean a cell that had urine or feces on the floor, [he] did not use that broom or mop to clean another cell without the broom or mop being thoroughly disinfected first."  *Id.*

Defendant Beck says that he was also trained in the WCDC cleaning practices.   (ECF No. 35-18, p. 1).  "In the segregation areas, officers had to sweep and mop each individual cell because the detainees in those areas were often not allowed to use the mop or broom themselves.

---

[13] Plaintiff also filed a lawsuit about the conditions of confinement of the WCDC "ISO" cells. *See* Amended Complaint, *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05218-TLB-CDC (W.D. Ark. Dec. 27, 2022).   That lawsuit remains pending.

Otherwise, the detainees were responsible for keeping their own cell clean." *Id.* According to Defendant Beck, "[i]f a cell obviously contained human waste, [they] were required to move the detainee out of the cell and then officers and trustees would clean and disinfect the cell. Any mops or brooms or towels used in a cleaning like this could not be used anywhere else until they were cleaned." *Id.* at p. 2. Defendant Beck says that he "did not ever intentionally spread feces or urine all over [Plaintiff's] cell with a contaminated mop or broom; [and that he] did not ever use a broom or mop in [Plaintiff's] cell immediately after [he] used the broom or mop to clean up human waste." *Id.* Defendant Beck says doing so "would have been a policy violation and [he] would have been in trouble for doing that." *Id.*

Defendants Nunziato, Martinez, Drumright, and Bilbrey were similarly trained, recall the same policy and same consequences for violating the WCDC policy for cleaning cells contaminated with human waste. *See* (ECF No. 35-15); (ECF No. 35-16); (ECF No. 35-17); (ECF No. 35-19). All four defendants—like Defendants Beck and Fry—maintain that they never intentionally spread feces, urine, vomit, or any other human waste from one cell to another with a contaminated mop.[14] *See* (ECF No. 35-15, p. 2); (ECF No. 35-16, p. 2); (ECF No. 35-17, pp. 2-3); (ECF No. 35-19, p. 2).

---

[14] Defendants submitted security footage of Plaintiff holding up a piece of paper containing several smashed bugs while he was housed in "ISO-4." *See* (ECF No. 35-10). Plaintiff also discusses the conditions of ISO-4, (ECF No. 1, p. 11), but, as noted above, the conditions of ISO-4 are the subject of a separate pending lawsuit. *See Scharnhorst v. Cantrell, et al.*, 5:22-CV-05218-TLB-CDC (W.D. Ark. Dec. 27, 2022). Thus, this Court does not consider whether the conditions of Plaintiff's confinement in ISO-4 violated his constitutional rights *here*; instead, the Court views his grievances about those conditions in the context of his claim that he had been grieving about his conditions at the WCDC for over a year. A fact which is not disputed. *See* (ECF No. 35-3).

## IV.   ANALYSIS

Plaintiff asserts that there are genuine issues of material fact that preclude summary judgment in this case.   (ECF No. 66).   To be sure, the parties do not agree on much.   But "the mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."   *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023).   For the reasons described below, to the extent that there are factual disputes in the record, those disputes do not preclude summary judgment on all but one claim:   Plaintiff's claim against Defendants Nunziato, Martinez, Bilbrey, Fry, Drumright, and Beck in their individual capacities for "forcing themselves into [Plaintiff's cell] with brooms and mops contaminated with urine and feces and spreading it all over [his] floor."   (ECF No. 1, p. 12).

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must allege a violation of a constitutional right committed by a person acting under color of state law."   *Andrews v. City of West Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006).   "Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).   Here, each defendant is named in his individual and official capacity as an agent of the entity for which he works: Washington County, Arkansas.   This Court starts with Plaintiff's individual capacity claims.

### A.   Individual Capacity Claims

Defendants contend they are entitled to qualified immunity on Plaintiff's individual capacity claims.   (ECF No. 34).   "Qualified immunity shields officials from civil liability in

26

§ 1983 actions when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019). "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* (quoting *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014)). "Unless both of these questions are answered affirmatively, [a defendant] is entitled to qualified immunity." *Id.* "And courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.*

### 1. Defendant Cantrell

This Court begins with Plaintiff's claims against Defendant Cantrell.

There is no dispute that Defendant Cantrell is not personally responsible for the maintenance of the WCDC HVAC (claim one) and plumbing systems (claim two) or lighting fixtures (claim three). Further, Plaintiff does not identify Defendant Cantrell as one of the six defendant who "used [the] issue of filth to harass and antagonize" him by "forcing themselves into [his] cell with brooms and mops contaminated with urine and feces and spreading it all over [his] floor" (claim four).[15] (ECF No. 1). Thus, as this Court understands it, Plaintiff seeks to attach

---

[15] While Plaintiff identifies Cantrell as a defendant to claim four and asserts that those defendants "refuse to clean up after meals, they throw trash onto the floor," and fail to properly clean "the feces spread onto the walls, floors, doors, kiosk, phones, tablets, dining tables, etc.," (ECF No. 1, p. 11), there are no facts (disputed or otherwise) establishing that Defendant Cantrell was personally involved or responsible for cleaning the WCDC in any respect. Accordingly, to the extent that Plaintiff seeks liability against Defendant Cantrell for his alleged personal involvement in this conduct (as opposed to a failure to supervise or train theory of liability), Defendant Cantrell is entitled to summary judgment.

liability to Defendant Cantrell for his purported supervisory role as chief deputy.[16]

In section 1983 actions, however, "supervisory liability is limited." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). "A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994). Rather, "[w]hen a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021).

Plaintiff's claims against Defendant Cantrell for "failure to supervise or train" Defendants Caudle, Nunziato, Fry, Beck, Drumright, Bilbrey, and Martinez fail for one basic reason: it is undisputed that Defendant Cantrell was not responsible for supervising or training these defendants.

As chief deputy, "training in the various operations of the Sheriff's office (whether enforcement, administrative, or detention) was not part of [Defendant Cantrell's] regular duties." *Id.* at p. 2. Rather, the WCDC "is managed by Randall Denzer. Major Denzer supervises the chain of command within the Detention Center that operates by four shifts, each with Lieutenants, who are supervised by the Captain over the Detention Center." *Id.* at pp. 1-2. "[V]arious day to day aspects of the operations are generally handled within each shift. Only those issues that cannot be resolved by a shift are raised to the attention of the captain; only those day to day issues

---

[16] Defendant Cantrell was Chief Deputy of the WCSO during the events giving rise to Plaintiff's Claims. (ECF No. 35-13, p. 1). He is currently the Sheriff of Washington County. (ECF No. 35-13, p. 1).

that cannot be resolved by the Captain are raised to the Major." *Id.*

Defendant Nunziato describes himself as "a Corporal at the [WCSO], where [he] serve[s] in the [WCDC]." (ECF No. 35-15, p. 1). Defendant Martinez is a "deputy first class [DFC] at the [WCSO], where [he] serve[s] in the [WCDC]." (ECF No. 35-16, p. 1). Defendant Drumright is also a "deputy first class [DFC] at the Washington County Sheriff's Office." (ECF No. 35-19, p. 1). At the time giving rise to Plaintiff's claims, Defendant Bilbrey "was employed as a detention officer in the Washington County Detention Center." (ECF No. 35-17, p. 1). Similarly, Defendants Beck and Fry were employed as detention officers in the Washington County Detention Center when Plaintiff was incarcerated. (ECF No. 35-18, p. 1); (ECF No. 35-20, p. 1). Accordingly, it is undisputed that Defendant Cantrell did not supervise Defendants Nunziato, Fry, Beck, Drumright, Bilbrey, and Martinez.[17]

Further, Defendant Cantrell "did not supervise the maintenance employees of Washington County who operated in the Washington County Sheriff's offices or the detention center." *Id.* He does not and did not train or supervise Defendant Caudle. *Id.* Indeed, Defendant Cantrell is "not qualified to provide training on building maintenance at the Washington County Detention Center." *Id.* According to Defendant Cantrell, "[Defendant] Caudle's job should have been evaluated on a regular basis by his supervisor, Kory Weathers. [He] would not have participated in that process." *Id.* Indeed, Kory Weathers is identified as Defendant Caudle's supervisor on his 2021 performance evaluation. (ECF No. 35-8, p. 1). And Defendant Caudle similarly identifies Kory Weather as his supervisor. (ECF No. 35-14, p. 1).

---

[17] Plaintiff's claims against Randall Denzer were dismissed after preservice screening for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1). (ECF Nos. 8 & 11).

For his part, Plaintiff does not dispute that Defendant Cantrell neither directly supervised nor was responsible for training Defendants Caudle, Nunziato, Fry, Beck, Drumright, Bilbrey, or Martinez. (ECF No. 67).   Accordingly, this Court considers these facts undisputed for the purposes of summary judgment.   Fed. R. Civ. P. 56(e)(2).   Rather, Plaintiff asserts that he wrote letters to Defendant Cantrell putting him "on notice" of his conditions of confinement and thus Defendant's Cantrell's failure to take any corrective action in response to those letters constitutes "deliberate indifference."   (ECF No. 67).   Regardless of whether these letters put Defendant Cantrell "on notice" of Plaintiff's claims, it is undisputed that Defendants Caudle, Nunziato, Fry, Beck, Drumright, Bilbrey, and Martinez were not his subordinates.   Accordingly, summary judgment should be granted in favor of Defendants for Plaintiff's claim against Defendant Cantrell in his individual capacity for failure to supervise or train the other defendants.

## 2.   Defendant Caudle

Plaintiff's claims against Defendant Caudle for failing to properly maintain the WCDC HVAC and plumbing systems (claims one and two) and failing to timely repair light fixtures (claim three) concern Plaintiff's conditions of confinement.[18]

Under the Fourteenth Amendment, "a pretrial detainee's constitutional rights are violated if the detainee's conditions of confinement amount to punishment." *Morris v. Zefferi*, 601 F.3d

---

[18] To the extent that Plaintiff asserts that Defendant Caudle, who is also identified as a defendant to claim four, failed to clean up after meals, threw trash on the floor, and failed to properly clean feces from the facility, (ECF No. 1, p. 11), there are no facts in the record (disputed or otherwise) to suggest that Defendant Caudle was personally involved in any of that conduct.   Indeed, Defendant Caudle asserts that "[a]s a maintenance technician, [he is] not in charge of or involved in cleaning issues such as mold.   Those issues are handled by detention officers, Act 309 inmates, and detainees." (ECF No. 35-14, p. 6).   Accordingly, Defendant Caudle is entitled to summary judgment as to claim four in his individual capacity.

805, 809 (8th Cir. 2010) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).   There are two ways to determine whether conditions of confinement rise to the level of punishment.   First, "a plaintiff could show that the conditions were intentionally punitive." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (quoting *Bell*, 441 U.S. at 538).   Alternatively, "if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate government purpose or were excessive in relation to that purpose." *Id.* (quoting *Bell*, 441 U.S. at 538-39).   In considering conditions of confinement claims, courts view the "totality of the circumstances of [plaintiff's] confinement and not any particular condition in isolation." *Stearns*, 957 F.3d at 909.

### *"Freezing" Cell Conditions*

As a threshold matter, to establish individual liability under Section 1983, a "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiff says that cell conditions were "freezing" from January 20, 2022, to January 23, 2022.   (ECF No. 1).   Plaintiff does not dispute that "Arkansas Jail Standards" require the WCDC to maintain temperatures between 65 degrees and 85 degrees. (ECF No. 35, p. 11).   Defendants have presented evidence showing that the temperature in Plaintiff's cell block during this period in January fell below this standard for one hour on Friday, January 21, 2022, and for twenty-three hours from Saturday, January 22, 2022, to Sunday, January 23, 2022.  *See* (ECF No. 35-6).   Plaintiff counters that the temperature logs are not accurate because the thermostats are located towards the middle of the cell blocks, closer to the interior, whereas the cells themselves face the exterior.   (ECF No. 67, p. 5).

It is undisputed that Defendant Caudle's regular work schedule is from 5:00 am to 1:00 pm, Monday through Friday. (ECF No. 35-14, p. 2). It is further undisputed that Caudle reports to work outside of his normal working hours when the officer in charge of the detention center contacts him with an emergency. *Id.* The temperatures in Plaintiff's cell block fell below Arkansas Jail Standards outside of Defendant Caudle's normal working hours. *Id.* at pp. 4-5. It is undisputed, however, that no one contacted Caudle. *Id.* When Defendant Caudle returned to work on Monday, January 24, 2022, the temperature was above 70 degrees Fahrenheit throughout the day. *Id.* To the extent that Plaintiff maintains that the actual temperature in his cell was lower than the reported temperatures during that period in January 2022, the undisputed fact remains that Defendant Caudle was neither "on duty," nor made aware that the temperature in Plaintiff's cell block fell below Arkansas Jail Standards for 23 hours over the weekend.

Further, there are no particularized facts—disputed or otherwise—suggesting that Defendant Caudle did (or failed to do) something prior to leaving work on Friday, January 21, 2022, that caused the temperature in Plaintiff's cell block to fall below 65 degrees Fahrenheit for 23 hours. Defendant Caudle's "general responsibility" for overseeing the maintenance of the WCDC is, by itself, insufficient to establish the personal involvement necessary for individual § 1983 liability to attach. *See Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997). Thus, assuming, arguendo, that Plaintiff has established that the temperatures he experienced in his cell for approximately 23 hours constitutes a *constitutional* violation, the summary judgment record shows that Defendant Caudle was not personally responsible for the temperature of his cell during that timeframe. Defendant Caudle is therefore entitled to qualified immunity with respect to this claim.

### *"Sweltering" Conditions, Leaky Toilets, and "Black" Mold*

This leaves Plaintiff's claims alleging "sweltering" conditions from August 1, 2022, to August 2, 2022, exposure to "black mold," a leaky toilet from December 10, 2021, to January 31, 2022, a toilet overflowing with sewage, from July 19, 2022, to July 21, 2022, and a broken light fixture from August 22, 2022 to October 3, 2022.

"In analyzing whether a condition of confinement is punitive, courts decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) (quoting *Bell*, 441 U.S. at 535-37) (cleaned up).   "Unless the detainee can show an expressed intent to punish, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to such alternative purpose." *Id.* (cleaned up). Here, however, even if Plaintiff's exposure to black mold, sweltering heat for two days, a leaky toilet for over a month, a toilet backed up with sewage for three days, and a broken light fixture for over a month violated his Due Process rights, Defendant Caudle would nevertheless be entitled to summary judgment because the right to be free from such conditions was not "clearly established" at the time.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).   Federal courts "do not define clearly established law at a high level of generality."   *Id.* (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc)).   "Rather [courts] look for a controlling case or a robust consensus of persuasive authority. There need not be a prior case directly on point, but

'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Dillard*, 961 F.3d at 1052)).

Pretrial detainees "are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). "Conditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Beaulieu*, 690 F.3d at 1045 (quoting *Whitnack v. Douglas Cnty.*, 16 F.3d 945, 958 (8th Cir. 1994)).

Such broad statements of the law, however, do not address the circumstances presented here.   As far as this Court is aware, there is no case law establishing that exposure to a leaky toilet for over a month constitutes a constitutional violation, particularly where, as here, there are no facts suggesting that this particular toilet was leaking sewage, there are no facts suggesting that the Plaintiff was injured or was not able to use *this or any* toilet because of the leak, and it is undisputed that the Defendant made efforts (albeit unsuccessfully) to remedy the problem.   *See Frye v. Pettis Cnty. Sheriff Dept.*, 41 F. App'x 906, 907 (8th Cir. 2002) (no Eighth Amendment violation where pretrial inmate was exposed to a leaky toilet for 10 weeks, inmate was provided with blankets and towels to absorb the water, but nevertheless slipped and fell, hitting his head and back on the toilet and the floor).   Accordingly, Plaintiff's right to be free from a leaky toilet for over thirty days was not clearly established at the time and therefore Defendant Caudle is entitled to qualified immunity on this claim.

Further, Defendant Caudle is entitled to qualified immunity for Plaintiff's claim that his cell was "sweltering" on August 1, 2022, and August 2, 2022.   (ECF No. 1, p. 6).   Plaintiff

contends that the HVAC in his cell block quit working during this timeframe because the HVAC system is poorly maintained by Defendant Caudle.  *Id.*  For his part, Defendant Caudle offers no evidence of the temperatures in Plaintiff's cell for those two days in August 2022.  *See* (ECF No. 35-1 – 35-22).  But the "length of time a prisoner is subjected to harsh conditions is a critical factor" in determining whether a pretrial detainee's conditions of confinement are unconstitutionally punitive.  *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) ("Conditions such as a filthy cell may be tolerable for a few days are intolerably cruel for weeks or months.").  Here, Plaintiff was exposed to sweltering conditions for merely two days and there is no evidence that he lacked access to circulating air during those two days or he suffered any injury or adverse consequence from these conditions.  Because neither party has submitted any case law (and this Court finds none) establishing that such conditions—exposure to "sweltering" temperatures for two days without suffering any consequence from that exposure—constitutes a constitutional violation, Defendant Caudle is entitled to qualified immunity on this claim.

The question of Plaintiff's exposure to a backed-up toilet for three days is even more plain. In *Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996), the plaintiff, a pretrial inmate, alleged that he was subjected to an overflowed toilet in his isolation cell and "was made to endure the stench of his own feces and urine" for four days, but he did not allege that he was exposed to disease or suffered any other consequence from the exposure.  *Id.* at 268.  Here, it is disputed whether the sewage from Plaintiff's toilet overflowed into his cell or remained contained in the toilet bowl. *Compare* (ECF No. 35-17, p. 3) *with* (ECF no. 35-3, p. 44).  But there are no facts—disputed or otherwise—to suggest that Plaintiff suffered injury or any other consequence from this exposure. (ECF No. 67).  Thus, even if sewage backed-up into Plaintiff's cell and remained in Plaintiff's

35

cell for three days, Defendant Caudle is nevertheless entitled to qualified immunity because such a condition is clearly not a constitutional violation.  *Id.* (concluding that plaintiff's allegation of being exposed to "raw sewage" for four days did not rise to the level of constitutional significance").

Turning to the issue of "black mold," (ECF No. 1, p. 11), the parties do not dispute that mold has been found to grow at the WCDC. (ECF No. 35-13, p. 3); (ECF No. 35-14, p. 6).   But the parties dispute that the mold is caused by Defendant Caudle's failure to maintain the WCDC HVAC system.   Regardless, however, the Eighth Circuit recently concluded that in the context of prison conditions and exposure to mold and other allergens, "a reasonable officer could glean little to no guidance from Eighth Circuit precedent about how to address the presence of a common mold in the jail, especially at the levels alleged."  *Thurmond*, 972 F.3d at 1013.

Here, there are no facts asserting that the mold to which Plaintiff claims he was exposed was toxic or that he suffered any injury from his exposure.   Given these circumstances, therefore, as the Eighth Circuit noted in *Thurmond*, even if pretrial detainees have a constitutional right to be free from mold, that right was not "clearly established" at the time giving rise to Plaintiff's claims.  *Id.*   Defendant Caudle is therefore entitled to qualified immunity.

### *Broken Light Fixture*

This leaves the broken light fixture.   Much about this light is disputed.   In what appears to be Plaintiff's initial grievance on the matter, Plaintiff describes his cell on August 24, 2022, as "gloomy without a full functionality of the light."   (ECF No. 35-3, p. 55).   Two weeks later, on September 7, 2022, Plaintiff submitted a grievance saying that his light is not fixed and that "the bulb is glitching, flickering on and off like a strobe light at times making [him] sick to [his]

stomach and hurting [his] eyes."   (ECF No. 35-3, p. 62).   In response to Defendants' Motion for Summary Judgment, Plaintiff asserts that "[his] light flickered from August 23rd until September 18th and then finally went out completely."   (ECF No. 67, p. 12).[19]

Defendant Caudle says that on Thursday, September 29, 2022, a maintenance ticket was submitted describing the light in Plaintiff's cell as "out and needs replace." (ECF No. 35-14, p. 10).   Defendant Caudle says that he did not prioritize earlier maintenance requests about the light fixture in Plaintiff's cell because he did not understand those requests to say that the light was completely out.[20]   (ECF No. 35-14, pp. 8-10).   According to Defendant Caudle, reports of light fixture being completely out is a priority because detention officers cannot house an inmate in a cell without a functioning light.   *Id.*   In this case, when Defendant Caudle reported to Plaintiff's cell on Monday, October 3, 2022, he says he "found that the screws had been removed from the cover on the housing and the bulbs had been jarred, knocking them loose from the 'tombstones.'" *Id.*   Defendant Caudle says that "it was not necessary to replace the fixture or all of the light bulbs.

---

[19] In opposition to Defendants' Motion for Summary Judgment, Plaintiff submitted an affidavit, which incorporates by reference his 30-page Statement of Disputed Material Facts.   (ECF No. 67, p. 30).   Thus, this Court considers Plaintiff's Statement of Disputed Material Facts as though it had been signed under penalty of perjury, as well.

[20] Defendant Caudle concedes that he received a maintenance request on September 19, 2022, reporting that the light in A1-24 (Plaintiff's cell) was "not working," and a maintenance request on September 27, 2022, saying that the light was "broken," but he explains that he did not identify these requests as a priority because "officers did not indicate that it was urgent because the cell was dark or that the cell could not be used."   (ECF No. 35-14, p. 9).   Plaintiff repeatedly refers to Defendant Caudle (and others) as liars.   *See* (ECF No. 67).   Such conclusory accusations are not evidence.   While Plaintiff plainly does not consider Defendant Caudle's statements credible, this Court does not make credibility determinations at summary judgment.   *See Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [she] is ruling on a motion for summary judgment or for a directed verdict.   The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

37

All that was necessary was to put the bulbs back into the 'tombstones' by ¼ turn of the bulbs." *Id.* According to Defendant Caudle, "[t]he darkness in the cell was caused by the bulbs were not in the tombstones properly.   This issue would only occur when the screws were removed from the housing, causing the cover to be able to be pried open and allowing someone to knock the bulbs loose." *Id.*

Defendants Nunziato, Martinez, and Bilbrey do not recall Plaintiff being housed in a "dark" cell. (ECF No. 35-15, p. 2); (ECF No. 35-16, p. 2); (ECF No. 35-17, p. 3).   Defendant Drumright says that he recalls Plaintiff's light going "out," and he reported it to [his] corporal.   (ECF No. 35-19, p. 3).   Plaintiff disputes any implication that he manipulated the light fixture, claiming that "[t]he screws on the light fixture were so tight in fact that Lewis Mayfield had to cut them off with a power cutter in order to replace the bulbs." (ECF No. 67, p. 22). Plaintiff, moreover, maintains that Defendant Caudle was aware that his light was not working but intentionally ignored the repair.   *Id.*

Notwithstanding these disputes, there are also several *undisputed* facts about Plaintiff's light fixture: It is undisputed that Plaintiff was exposed to these conditions for approximately six weeks (from August 23, 2022, to October 3, 2022), and that during this time frame Plaintiff was "let [] out of [his] cell for [his] daily hour out." (ECF No. 1, p. 10). Further, it is undisputed that while the "flickering" light made him sick to his stomach and hurt his eyes, Plaintiff did not have a preexisting condition such as epilepsy that would make him particularly susceptible to injury from such conditions.   (ECF No. 35-3, p. 62).   Finally, Defendants submitted two security videos from September 12, 2022, one from 7:15 am to 7:45 am and a second from 7:15 pm to 7:55 pm. (ECF No. 35-10).   To the extent that Plaintiff's light fixture was malfunctioning (and Plaintiff

maintains his light was "flickering" during this time), the cell block common areas are clearly illuminated. *Id.*

While these factual disputes may preclude the Court from determining on summary judgment whether Defendant Caudle violated Plaintiff's constitutional rights, they do not preclude this Court from concluding that he is entitled to qualified immunity because, as far as the Court can tell, there is no controlling case law—persuasive or otherwise—establishing that Plaintiff has a right to a well-functioning light fixture, where, as here, it is undisputed that Plaintiff was not subjected to *continuous* darkness and that he was not particularly susceptible to injury from a "strobing" or "flickering" light fixture.

To be sure, federal courts in this Circuit have discussed whether the continuous *illumination* of cells constitutes a constitutional violation, again focusing on the length of time the detainee is subject to constant illumination.  In *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647 (8th Cir. 1996), for example, the plaintiff, a detainee, was confined to a "5 ½ by 5 ½ foot cell without a toilet or a sink and was forced to sleep on a mat on the floor under bright lights, which were on twenty-four hours a day" for approximately fourteen days before he was moved to a "regular cell."  *Id.* at 650. Noting that plaintiff "was observed sleeping ninety-three hours of the fourteen days spent in the vestibule," the Eighth Circuit concluded that the "totality of the circumstances—which include the relative short duration of the confinement, the necessity to keep the detainee under observation for both his medical condition as well as general safety concerns, and the amount of time that he spent out of the cell—supports the assertion of legitimate governmental interest, and therefore, does not constitute a violation of [plaintiff's] due process rights." *Id.* (internal citation omitted).  In *Shepherd v. Ault*, 982 F.Supp. 643 (N.D. Iowa 1997),

however, the district court denied summary judgment, concluding that plaintiffs' claims that they were subject to constant illumination for 283 and 550 nights, respectively, gives rise to "[v]ery different inferences [] concerning the effects of constant illumination when exposure to that condition is long term," including sleep deprivation.  *Shepherd,* 982 F. Supp. at 648.

This case, of course, is not about "constant illumination," but about a cell with a purportedly "dim" light, then a "flickering" light and then no light at all.   In *Shepherd,* the court also observed that "[t]here can be little doubt that subjecting prisoners to continuous *darkness* would at least raise a constitutional question." *Shepherd*, 982 F. Supp. 648 (citing *Wycoff v. Brewer*, 572 F.2d 1260, 1263 & n.5 (8th Cir. 1978)).   Further, "generally governmental authorities cannot deny basic human necessities to persons in custody… Those necessities include light, heat, ventilation, sanitation, clothing [,] and a proper diet." *Green v. Baron*, 879 F.2d 305, 309 (8th Cir. 1989).   But this level of generality does not put Defendant Caudle (or anyone else) on notice that failing to promptly repair a light fixture for six weeks, thereby allowing the light to "dim," then "flicker," and finally go "out," violates a detainee's constitutional rights where the detainee is exposed to light, and thus the "darkness" was not continuous.   Defendant Caudle is therefore entitled to summary judgment in his individual capacity as to Plaintiff's claims against him for exposing him to sweltering temperatures, a leaky toilet, backed up sewage, black mold, and a broken light fixture.[21]

---

[21] In Plaintiff's Statement of Disputed Material Facts, he contends that Defendant Caudle intentionally ignored his light for two weeks because Plaintiff was vocal with his complaints about "him, Tim Helder, Jay Cantrell, and the rest of the corrupt and incompetent deputies of Washington County Sheriff's Department."   (ECF No. 67, pp. 12-13). To the extent that Plaintiff asserts that Defendant Caudle's inaction was retaliation against him for exercising his First Amendment right to free speech, Plaintiff did not assert this claim in his Complaint.   (ECF No. 1).   Thus, the Defendants have not had an opportunity to respond to it.   This Court will not consider a new claim

### 3.   Defendants Nunziato, Martinez Fry, Beck, Drumright, Bilbrey

This leaves Plaintiff's claim against Defendants Nunziato, Martinez, Fry, Beck, Drumright, and Bilbrey in their individual capacities for "harass[ing] and antagoniz[ing] [him] by forcing themselves into [his] cell with brooms and mops contaminated with urine and feces and spreading it all over [his] floor" after he filed numerous complaints and grievances about the purportedly filthy condition of the WCDC.   (ECF No. 1, p. 12).   There is no dispute that Plaintiff filed multiple grievances about the general condition of the WCDC.   (ECF No. 35-3). But Defendants Nunziato, Martinez, Fry, Beck, Drumright, and Bilbrey dispute that they intentionally used mops contaminated with urine and feces to clean his cell.   (ECF Nos. 35-15; 35-16; 35-17; 35-18; 35-19; 35-20).

 "When there is no dispute among the parties as to the relevant facts . . . a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity."   *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)).   Here, however, there is a relevant fact dispute about what the Defendants did (or did not do).   The Defendants swear under penalty of perjury that they did not use contaminated mops to clean Plaintiff's cell, Plaintiff swears under penalty of perjury that they did.   While Defendants contend that this dispute is immaterial because Plaintiff was responsible for cleaning his own cell, (ECF No. 35-3, p. 2; ECF No. 37, p. 28), it appears this fact is also in dispute, *see* (ECF No. 67, p. 203).

Viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that given Plaintiff's frequent grievances about his conditions of confinement at the WCDC, and the

_____

on summary judgment.

Defendants' knowledge of those grievances, the Defendants intended to punish Plaintiff by cleaning his cell with mops contaminated with feces and urine.    Defendants Nunziato, Martinez, Bilbrey, Fry, Drumright, and Beck should therefore not be entitled to qualified immunity at summary judgment. *See Pace*, 201 F.3d at 1056 ("In the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground.").

On final matter requires some discussion, recognizing that pro se pleadings are to be liberally construed, this Court also views Plaintiff's allegations against Defendants Nunziato, Martinez, Bilbrey, Fry, Drumright, and Beck as a retaliation claim.    To prevail on a retaliation claim, a plaintiff must show that "[he] engaged in protected [First Amendment] activity." *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 338 (8th Cir. 2023) (internal citation omitted).    "If [the plaintiff] can make that showing, then the focus shifts to whether the officers took an adverse action . . . that would chill a person of ordinary firmness from continuing in the protected activity." *Id.* (cleaned up). If so, "then the next hurdle is causation: was the First Amendment activity a 'but-for cause' of the injury?"    *Id.*    To get past qualified immunity, the plaintiff must show also that it would have been "sufficiently clear [to] every reasonable official ... that what [they were] doing violate[d]" the First Amendment.    *Id.*

Here, this Court did not specifically frame Plaintiff's claim as a potential retaliation claim in its preservice screening report and recommendation. (ECF No. 8). The Defendants, in their Motion for Summary Judgment, did not analyze this claim in terms of retaliation.    Thus, this Court orders Defendants to file a supplemental motion for summary judgment specifically (and exclusively) analyzing Plaintiff's claim against Defendants Nunziato, Martinez, Bilbrey, Fry,

Drumright, and Beck as a First Amendment retaliation claim within 45 days of the date of this report and recommendation.   Upon receipt, Plaintiff will be provided a reasonable opportunity to respond.   No further discovery is authorized.

### B.   Official Capacity Claims

This leaves Plaintiff's official capacity claims. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014) (quoting *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006)). "Although there must be an unconstitutional act by a municipal employee before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotations and citations omitted).

### 1.   Defendant Cantrell

The Court first considers Plaintiff's official capacity claims against Defendant Cantrell for failure to supervise or train.   A "local government may be subject to § 1983 liability for 'inadequate training of its employees where (1) the county's training practices were inadequate; (2) the county was deliberately indifference to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by the county; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's injury." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (cleaned up).   "It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the

city can reasonably be said to have been deliberately indifferent to the need." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (internal quotation omitted). Put differently, "the plaintiff must demonstrate that the [municipality] had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Id.*

With respect to Defendant Caudle, it is undisputed that he has "had specific training regarding the maintenance of various functions of the Washington County Detention Center. That training has been provided by professionals or, in some instances, by the manufacturer of the products used in the Washington County Detention Center such as the plumbing fixtures." (ECF No. 35-14, p. 2). Even if this training is deficient, however, "the identified deficiency in [] a training program must be closely related to the ultimate injury such that the deficiency in training actually caused the [official's] offending conduct." *Andrews*, 98 F.3d at 1077.

Here, the purported deficiency in Defendant Caudle's training—as Plaintiff sees it—is that Defendant Caudle did not act faster, more efficiently, or more effectively in performing his job duties. The problem with this argument, however, is that Plaintiff simply cannot demonstrate that a deficiency in training *caused* him to be exposed to black mold, "sweltering temperatures" for two days, a leaky toilet for over a month, a toilet backed-up with sewage for three days, or a faulty light fixture for six weeks. Indeed, it is undisputed that detainees block the air vents to manipulate the temperatures in their cells, that detainees stuff clothing into the pipes to interfere with the plumbing, and that the facility is aging, suffers from suboptimal staffing levels, and is at a "near constant state of being overpopulated." (ECF No. 35-22). The conditions Plaintiff experienced, therefore, are not necessarily closely related to Defendant Caudle's training (or lack thereof), but to the conduct of other detainees and the operational capacity of the facility itself.

Similarly, Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright and Fry all completed the "basic detention officer course" and are familiar with the policies and procedures of the jail, including its cleaning practices. (ECF No. 35-15, p. 1); (ECF No. 35-16, p. 1); (ECF No. 35-17, p. 1); (ECF No. 35-18, p. 1); (ECF No. 35-19, p. 1); (ECF No. 35-20, p. 1). Defendant Bilbrey, for one, describes the "detention officer training program" as "a program that includes two weeks of classroom and practical training and then a few more weeks of training in the detention center under a training officer." (ECF No. 35-17, p. 1).

WCDC cleaning policies, moreover, require that "[c]ells and dayrooms [are to be] kept clean and sanitary at all times by daily sweeping and mopping. . .. Floors shall be swept and mopped daily or, if needed, more often.   Disinfectants, germicides, and deodorants shall be used in proper quantity." (ECF No. 35-11, p. 5). Further, these policies explain that "[t]he primary objective of the detention center is to maintain positive control over incarcerated individuals and to ensure an arrestee's timely appearance in court.   It is NOT to inflict punishment." *Id.* at p. 6 (emphasis in the original). On their face, these policies do not appear constitutionally deficient. But even if they were, Plaintiff has failed to show that a deficiency in training or supervision *caused* Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry to purportedly "punish" him by using dirty mops to clean his cell.   Defendant Cantrell, therefore, is entitled to summary judgment on the claims against him in his official capacity.

### 2.  Defendants Caudle, Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry

This Court now turns to Plaintiff's official capacity claims against Defendants Caudle, Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry.

As a threshold matter, there is no evidence to suggest that Defendants Caudle, Nunziato,

Martinez, Bilbrey, Beck, Drumright and Fry were acting pursuant to some unconstitutional official policy.  In addition to the cleaning policies noted above, WCDC policies require "the detention center [to be] kept at a reasonable temperature and be properly ventilated at all times." (ECF No. 35-11, p. 5). Policies also require "sufficient lighting [be] provided commensurate with the time of day.  Lighting shall be sufficient to read, write, and work during daylight hours. Lighting during nighttime shall be sufficient for officers and detainees to move around safely within the detention center." *Id.* Thus, this Court considers whether the Defendants acted pursuant to some unconstitutional unofficial custom.

To establish the existence of a municipal "custom," a plaintiff must show:

1. The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees;

2. Deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice to the officials of that misconduct; and

3. The plaintiff's injury by acts pursuant to the municipality's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir.1999).

*Defendant Caudle*

With respect to Defendant Caudle, as the Court understands it, Plaintiff points to the pages of WCDC Help Desk maintenance tickets requesting that Defendant Caudle address heating, cooling, plumbing, and lighting problems throughout the WCDC as evidence of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees." (ECF No. 67, pp. 32-135). This Court does not agree.

To be sure, these maintenance tickets reflect repeated requests for Defendant Caudle to

46

address maintenance needs throughout the facility. (ECF No. 67, pp. 32-135). But they also reflect Defendant Caudle's efforts to address those requests. *Id.* While Plaintiff plainly objects to the quality of those efforts, he fails short of identifying multiple instances where Defendant Caudle's inaction (or slow to action) amounts to a *constitutional* violation. Thus, the Court finds that there is no evidence on summary judgment of a "pattern of unconstitutional conduct [] so pervasive and widespread 'as to have the effect and force of law.'" *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *Fowler*, 98 F.3d at 1075)).

Further, even if the evidence established the requisite pattern, Plaintiff's official capacity claim fails on causation (element three). To succeed on an official capacity claim, the plaintiff must show that "a constitutional violation was committed pursuant to an official 'policy or custom' and that such 'policy or custom' was the moving force behind plaintiff's injury." *Burlison v. Springfield Pub. Schs*, 708 F.3d 1034, 1041 (8th Cir. 2013) (internal quotation omitted). Here, as noted above, although Plaintiff contends that Defendant Caudle's failure to properly maintain the facility caused his constitutional rights to be violated, it is undisputed that detainees created maintenance problems by clogging toilets and blocking air vents, for example. Thus, Plaintiff has failed to establish that the purported custom of failing to properly maintain the facility was the moving force of the violation as opposed to some other intervening factors, such as vandalism by detainees.   Defendants, therefore, should be granted summary judgment as to the claim against Defendant Caudle in his official capacity.

### *Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry*

While the individual capacity claims against Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry for spreading feces and urine in Plaintiff's cell using dirty mops survives

47

summary judgment, Plaintiff's corresponding official capacity claim meets a different fate.  As noted above, to establish an official capacity claim, a plaintiff must show, among other things, "deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice to the officials of that misconduct." *Mettler*, 165 F.3d at 1204. Here, Plaintiff asserts that when he discussed the issue with Captain Ake, Captain Ake ordered detention officers to clean the cell containing inmate feces and urine last rather than first so that those same mops and brooms would not later be used to clean Plaintiff's cell.  (ECF No. 67, p. 15).  Even if Captain Ake was a "policymaking official" for the purposes of official capacity claims and was thus on notice of the fact that detention officers were using mops and brooms used to clean urine and feces in other cells during the same "cleaning session," Captain Ake, by ordering detention officers to clean the cells in a different order, was plainly not "deliberately indifferent" to the alleged violation.  By contrast, he attempted to address it.  Plaintiff's official capacity claims against Defendants Nunziato, Martinez, Bilbrey, Fry, Drumright, and Beck are therefore entitled to summary judgment.

## V.   CONCLUSION

Accordingly, for the reasons described above, this Court recommends that Defendants' Motion for Summary Judgment be **GRANTED, in part, and DENIED, in part, as follows:**

1.  Defendants' Motion for Summary Judgment as to Plaintiff's individual capacity claims against Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright, and Fry for allegedly spreading feces and urine in his cell is **DENIED**.

2.  Defendants' Motion for Summary Judgment is **GRANTED** in all other respects.

3.   Defendants are further **ORDERED** to submit a supplemental motion for summary

judgment addressing Plaintiff's claim that Defendants Nunziato, Martinez, Bilbrey, Beck, Drumright and Fry retaliated against him in violation of the First Amendment by using dirty mops to clean his cell within 45 days of the date of this order.   Upon receipt, Plaintiff will be directed to respond.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**RECOMMENDED** this 11th day of July 2024.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE